1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    ERROL LOVELL UNDERWOOD,              No.  2:17-CV-0174-KJM-DMC-P

12                 Plaintiff,

13         v.                              <u>FINDINGS AND RECOMMENDATIONS</u>

14    R. TAN, et al.,

15                 Defendants.

16

17              Plaintiff, a prisoner proceeding pro se, brings this civil rights action pursuant to

18    42 U.S.C. § 1983. Pending before the Court are Defendants' motions for summary judgment and

19    to dismiss.[1]  <u>See</u> ECF Nos. 26 and 35.  Defendants' motion for summary judgment was filed on

20    October 28, 2019, and their motion to dismiss was filed on March 3, 2020.  Despite being granted

21    numerous extensions of time, both motions are unopposed.

22    / / /

23    / / /

24    / / /

25    / / /

26

27    _____

            [1]        Defendants state that Plaintiff has misspelled various names; "Egipto as Eqipto,
28    Kuersten as Knersten, and Ko as Cole." ECF No. 26-1, fn. 1. The Court shall address Defendants
      by the names offered in their motions.

                                              1

# I. PLAINTIFF'S ALLEGATIONS

This action proceeds on Plaintiff's civil rights complaint, filed on January 26, 2017. See ECF No. 1. Plaintiff names the following as Defendants: (1) Nurse Egipto; (2) Dr. Tan; (3) Dr. Largoza; (4) Dr. Kuersten; and (5) Dr. Ko.

Plaintiff Errol Underwood is an inmate in the custody of the California Department of Corrections and Rehabilitation (CDCR), and at all times relevant to this lawsuit was housed at California State Prison - Solano (SOL or prison) in Vacaville, CA. Plaintiff alleges that on February 1, 2016, he was shot by a 40 millimeter weapon[2] in his right calf and right elbow during a physical altercation at the prison. See ECF No. 1, pg. 5. After the incident, Plaintiff was transported to the prison infirmary and was seen by Nurse Egipto. Plaintiff told Egipto that he felt that he had broken his arm, but Egipto dismissed the injury as swelling which would subside.

Plaintiff was subsequently escorted to administrative segregation. Plaintiff continued to suffer pain due to his injury and, after four days, pleaded for additional medical assistance. On February 4, 2016, Plaintiff was seen by Nurse Lahara inside administrative segregation. Lahara allegedly acknowledged the poor condition of his injury and asked why Plaintiff did not contact the medical staff sooner. Lahara then sent Plaintiff to have x-rays taken and a soft cast was subsequently placed on his arm. Plaintiff was then scheduled to see a physician at San Joaquin General Hospital who stated that Plaintiff suffered from fractures in his arm.

On February 18, 2016, and March 1, 2016, Plaintiff had medical appointments with Dr. Tan. Plaintiff requested a change in his prescription medication, but Dr. Tan refused. Plaintiff claims that Dr. Tan submitted false reports stating that Plaintiff had no family and was exercising regularly. At some later date, Nurse Lahara informed plaintiff that Dr. Tan had placed a request for an MRI scan for Plaintiff; however, that request was denied.

/ / /

---

[2]   Plaintiff's complaint does not specify what sort of weapon caused the injury, but Defendants state that "he was shot in his right calf and right arm by a 40 mm foam round." Plaintiff offers no opposition to this assertion.

2

1    Defendants Largoza and Kuersten were both members of the Institutional

2  Utilization Management Committee (Committee) and allegedly denied Plaintiff MRI access

3  despite being aware of the gunshot wound to his elbow.

4    On October 3, 2016, Plaintiff was seen by Dr. Ko. Plaintiff claims that Dr. Ko

5  recognized the severity of his condition and told Plaintiff that he would place a request for an

6  MRI scan. On November 8, 2016, Plaintiff did in fact receive an MRI scan; however, he was

7  never given the results of that scan. Plaintiff's condition deteriorated and he was eventually

8  admitted to San Joaquin General Hospital for four days.

9    Upon his return to the prison, Plaintiff had a subsequent appointment with Dr. Ko

10  on December 7, 2016. Plaintiff told Dr. Ko about the extreme pain in Plaintiff's elbow. However,

11  Dr. Ko simply told Plaintiff to be patient. Dr. Ko allegedly failed to provide Plaintiff with

12  adequate pain medication.

13    Plaintiff claims that the Defendants violated his Eighth Amendment rights due to

14  their indifference to his medical needs. Plaintiff requested medical treatment for his arm injury,

15  but was refused by Defendant Egipto. Plaintiff alleges defendants Tan and Ko refused to provide

16  him with necessary medical treatment, specifically an MRI, and denied him adequate pain

17  medication. He further alleges defendants Largoza and Kuersten also denied Plaintiff an MRI,

18  even though it was requested by another doctor.

19

20                          **II. PROCEDURAL HISTORY**

21    Plaintiff filed his complaint on January 26, 2017, alleging constitutional violations

22  against Defendant Dr. Tan, Dr. Ko, Dr. Largoza, Dr. Kuersten, and Nurse Egipto. See ECF No. 1.

23  On July 3, 2018, Magistrate Judge Craig M. Kellison screened the complaint under 28 U.S.C.

24  § 1915A and found that Plaintiff stated a cognizable Eighth Amendment claim for deliberate

25  indifference to his serious medical needs, specifically that Egipto refused medical treatment, Tan

26  and Ko refused to provide an MRI and denied adequate pain medication, and that Largoza and

27  Kuersten denied him an MRI. See ECF No. 10, at 1-2. Defendants answered the complaint, and

28  the Court issued a Discovery and Scheduling Order on March 26, 2019. See ECF No. 22.

                                            3

1    Discovery was open until July 29, 2019, and is now closed. <u>See</u> ECF No. 22. On

2    October 28, 2019, Defendants filed their motion for summary judgment. <u>See</u> ECF No. 26. On

3    November 14, 2019, Plaintiff filed multiple requests for additional time to submit an opposition,

4    which the Court granted. <u>See</u> ECF Nos. 32 and 34. Pursuant to the Court's most recent time

5    extension, opposition to the pending motion for summary judgment was due by June 3, 2020. <u>See</u>

6    ECF No. 34. To date, Plaintiff has failed to submit an opposition to the pending motion for

7    summary judgment.

8    Additionally, Defendants note that Defendant Egipto has recently died and have

9    submitted a motion to dismiss Defendant Egipto pursuant to Federal Rule of Civil Procedure

10   25(a). <u>See</u> ECF No. 35.  This motion is also unopposed and should be granted.[3]

11

12                           **III. STANDARD FOR SUMMARY JUDGEMENT**

13   The Federal Rules of Civil Procedure provide for summary judgment or summary

14   adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file,

15   together with affidavits, if any, show that there is no genuine issue as to any material fact and that

16   the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  The

17   standard for summary judgment and summary adjudication is the same.  <u>See</u> Fed. R. Civ. P.

18   56(a), 56(c); <u>see also</u> <u>Mora v. ChemTronics</u>, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).  One of

19   the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  <u>See</u>

20   / / /

21   / / /

22   _____

23       [3]      On March 3, 2020, Defendants filed a motion to dismiss deceased Defendant
     Egipto because Plaintiff failed to file a motion for substitution. <u>See</u> ECF No. 35.  Under Federal
24   Rule of Civil Procedure 25(a)(1), a civil suit against a deceased party must be dismissed unless a
     party moves for substitution within 90 days of a service noting death. <u>See</u> Fed. R. Civ. P. 25.
25   After the deceased party is dismissed, the action proceeds with the remaining parties. <u>See</u> Fed. R.
     Civ. P. 25(a)(2).
26       On October 30, 2019, Defendants submitted an amended notice of suggestion of
     death of Defendant Egipto, notifying Plaintiff of Defendant Egipto's death. <u>See</u> ECF No. 30.  To
27   date, and despite having been granted an extension of time to respond to Defendants' motion to
     dismiss, no motion for substitution has been filed.  Because no motion for substitution has been
28   filed, Defendants' motion to dismiss should be granted and Defendant Egipto should be dismissed
     pursuant to Rule 25(a)(1).

1   Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Under summary judgment practice, the

2   moving party

3           . . . always bears the initial responsibility of informing the district court of
            the basis for its motion, and identifying those portions of "the pleadings,
4           depositions, answers to interrogatories, and admissions on file, together
            with the affidavits, if any," which it believes demonstrate the absence of a
5           genuine issue of material fact.

6           Id., at 323 (quoting former Fed. R. Civ. P. 56(c)); see also Fed. R. Civ. P. 56(c)(1).

7           If the moving party meets its initial responsibility, the burden then shifts to the

8   opposing party to establish that a genuine issue as to any material fact actually does exist.  See

9   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

10  establish the existence of this factual dispute, the opposing party may not rely upon the

11  allegations or denials of its pleadings but is required to tender evidence of specific facts in the

12  form of affidavits, and/or admissible discovery material, in support of its contention that the

13  dispute exists.  See Fed. R. Civ. P. 56(c)(1); see also Matsushita, 475 U.S. at 586 n.11.  The

14  opposing party must demonstrate that the fact in contention is material, i.e., a fact that might

15  affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S.

16  242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th

17  Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

18  return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

19  (9th Cir. 1987).  To demonstrate that an issue is genuine, the opposing party "must do more than

20  simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record

21  taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

22  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).  It is sufficient that "the

23  claimed factual dispute be shown to require a trier of fact to resolve the parties' differing versions

24  of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.

25          In resolving the summary judgment motion, the court examines the pleadings,

26  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.

27  See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed, see Anderson,

28  477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the

court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587.

Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

1987).  Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for the

judge, not whether there is literally no evidence, but whether there is any upon which a jury could

properly proceed to find a verdict for the party producing it, upon whom the onus of proof is

imposed." Anderson, 477 U.S. at 251.


## IV. THE EVIDENCE

Defendants' motion for summary judgment is supported by their statement of

undisputed facts, see ECF No. 26-2, as well as the sworn declarations of: (1) R. Tan, (2) N.

Largoza, (3) N. Kuersten, (4) F. Ko, (5) M. Kwaye, (6) Feinberg, and (7) Steven E. Vong.

Defendants state that the following facts are undisputed:

| Defendants' Undisputed Material Facts | Evidentiary Support |
|---|---|
| **I. THE PARTIES AND BACKGROUND INFORMATION.** ||
| 1. Plaintiff Errol Underwood (V-20128) is an inmate in the custody of the California Department of Corrections and Rehabilitation (CDCR), and at all times relevant to this lawsuit was housed at California State Prison - Solano (SOL) in Vacaville, CA. | 1. Pl.'s Complaint (Compl.), ECF No. 1 at 1-2. [footnote omitted] |
| 2. Plaintiff has not received any medical training. | 2. Deposition of Errol Underwood, Vol. I at 26:16-18 (Underwood Dep.) (Exhibit A to the Declaration of Steven E. Vong in Support of Defendants' Motion for Summary Judgment (Vong Dec.). |
| 3. Defendant, Nurse Egipto, worked with CDCR at SOL at all times relevant to this lawsuit. | 3. Declaration of Kwaye (Kwaye Decl.) at ¶ 4. |
| 4. Defendant, Dr. Tan, worked with CDCR at SOL at all times relevant to this complaint. | 4. Declaration of Tan (Tan Decl.) at ¶ 2. |

| | |
|---|---|
| 5. Dr. Tan was Plaintiff's primary care physician at SOL from February 18, 2016, through April 29, 2016. | 5. Tan Decl. at ¶ 2. |
| 6. At all relevant times to this lawsuit, Defendant Dr. Largoza was the Chief Physician & Surgeon (CP&S) at SOL, and reviewed and signed off on Plaintiff's health care appeal log number SOL HC 16041256. | 6. Declaration of Largoza (Largoza Decl.) at ¶¶ 1-3. |
| 7. At all relevant times to this lawsuit, Defendant Dr. Kuersten was the Chief Medical Executive at SOL. | 7. Declaration of Kuersten (Kuersten Decl.) at ¶¶ 1-4. |
| 8. Defendant, Dr. Ko, worked with CDCR at SOL at all times relevant to this complaint, and was Plaintiff's primary care physician at SOL from May 2016 to January 2017. | 8. Declaration of Ko (Ko Decl.) at ¶¶ 1-4. |

## II. PLAINTIFF'S PAIN TREATMENT

| | |
|---|---|
| 9. On February 1, 2016, Plaintiff was involved in a fight at SOL where he picked up an inmate and slammed the inmate to the ground. | 9. Underwood Dep., at 45:12-47:4, Exhibit B to Underwood Dep. |
| 10. Later that day, Plaintiff was involved in another fight, where he was shot in his right calf and right arm by a 40 mm foam round. | 10. Compl., ECF No. 1 at 5-6; Underwood Dep. at 47:11-48:25, Exhibit H to Underwood Dep. |
| 11. Plaintiff sustained a laceration to his neck, left ear, and right elbow on February 1, 2016, and he also had pain and a protrusion to his right elbow. | 11. Exhibit A of Appx of Exh.[footnote omitted]; Declaration of Feinberg (Feinberg Decl.) at ¶ 9. |
| 12. At 3:45 p.m. on February 1, 2016, Officer Hilton escorted Plaintiff to the Triage and Treatment Area (TTA), where he was treated for an ear laceration, and Registered Nurse (RN) Page noted "RTC" in stable condition. | 12. Exhibit A of Appx of Exh.; Feinberg Decl. at ¶ 9; Tan Decl. at ¶ 3a. |
| 13. Nurse Egipto was not at SOL, out sick, and did not see Plaintiff on February 1, 2016. | 13. Kwaye Decl. at ¶¶ 1-4; Feinberg Decl. at ¶ 32. |
| 14. On or around February 2, 2016, Plaintiff submitted a Health Care Services Request (CDCR form 7362) complaining of pain. | 14. Exhibit B of Appx of Exh; Tan Decl. at ¶ 3b; Feinberg Decl. at ¶ 10. |

| | |
|---|---|
| 15. Plaintiff was seen for this Request on February 4, 2016, by RN Lahara who noted "involved in altercation 3 days ago - slammed opponent - opponent landed on right arm, sustained big bruise and redness and swelling from inferior area of right upper arm past elbow to half of forearm. Unable to straighten right arm, with deformed right thumb." | 15. Exhibit C of Appx of Exh; Tan Decl. at ¶ 3c; Feinberg Decl. at ¶ 10. |
| 16. RN Lahara had Plaintiff transferred to the TTA for further evaluation. | 16. Exhibit C of Appx of Exh.; Feinberg Decl. at ¶ 10. |
| 17. On February 4, 2016, Dr. Kohler saw Plaintiff in the TTA, noting that Plaintiff was attacked 3 days ago on February 1, 2016, someone fell on his right arm and shoulder, and that he reported pain. | 17. Exhibit C of Appx of Ex.h; Tan Decl. at ¶ 3c; Feinberg Decl. at ¶ 11; Kuersten Decl. at ¶ 5a; Ko Decl. at ¶ 6a. |
| 18. Dr. Kohler ordered x-rays of Plaintiff's right shoulder, right humerus, right elbow, right forearm, right wrist, and right hand, finding mild arthritis but no fracture in the shoulder, no fracture of the humerus, and an olecranon avulsion fracture around the right elbow. | 18. Exhibit C of Appx of Exh.; Tan Decl. at ¶ 3c; Feinberg Decl. at ¶ 11; Kuersten Decl. at ¶ 5a; Ko Decl. at ¶ 6a. |
| 19. Plaintiff was prescribed Tylenol 3 (T3) with Codeine, an opioid pain medication, and Toradol for pain | 19. Exhibit C of Appx of Exh.; Tan Decl. at ¶ 3c; Feinberg Decl. at ¶ 11; Kuersten Decl. at ¶ 5a; Ko Decl. at ¶ 6a. |
| 20. Dr. Kohler applied a splint to Plaintiff's elbow, ordered follow-up with Plaintiff's Primary Care Provider (PCP), and submitted a request for referral to orthopedic surgery, which was approved by Dr. Largoza on February 5, 2016. | 20. Exhibit C of Appx of Exh.; Tan Decl. at ¶ 3c; Feinberg Decl. at ¶¶ 11-12; Largoza Decl. at ¶ 4; Kuersten Decl. at ¶ 5a; Ko Decl. at ¶ 6a. |
| 21. On February 5, 2016, Plaintiff went to the TTA again and was seen by RN Ogunleye because he was complaining of pain. | 21. Exhibit D of Appx of Exh.; Tan Decl. at ¶ 3d; Feinberg Decl. at ¶ 12. |
| 22. RN Ogunleye noted that Plaintiff's state was "Calm, no apparent distress" as he was awaiting to see the doctor at 12:15 that same day. | 22. Exhibit D of Appx of Exh.; Tan Decl. at ¶ 3d. |

| | |
|---|---|
| 23. Dr. Tarrar examined Plaintiff on February 5, 2016, noting that Plaintiff has pain from an altercation when someone fell on him, there was bruising around the elbow area, but the exam was otherwise unremarkable, Plaintiff was taking T3, and Plaintiff was "talking with officer and laughing and moving arm when distracted." | 23. Exhibit D of Appx of Exh.; Tan Decl. at ¶ 3d; Feinberg Decl. at ¶ 12. |
| 24. Plaintiff was provided a sling, had pain medication ordered, and was instructed about his medication and sling. | 24. Exhibit D of Appx of Exh.; Tan Decl. at ¶ 3d; Feinberg Decl. at ¶ 12. |
| 25. On February 8, 2016, Plaintiff was prescribed Sulindac, a nonsteroidal anti-inflammatory drug (NSAID) and capsaicin cream for his pain. | 25. Exhibit E of Appx of Exh.; Tan Decl. at ¶ 3e; Feinberg Decl. at ¶ 13. |
| 26. On February 12, 2016, Plaintiff went to San Joaquin General Hospital (SJGH), where Dr. William J. Holmes diagnosed an elbow contusion, did not believe the patient's avulsion fracture was new, discontinued the splint, and recommended an MRI of the elbow if Plaintiff continued to have significant pain with no improvement over the next two to four weeks. | 26. Exhibit F of Appx of Exh.; Tan Decl. at ¶ 3f; Feinberg Decl. at ¶ 14; Kuersten Decl. at ¶ 5b; Ko Decl. at ¶ 6b. |
| 27. On February 14, 2016, Plaintiff was seen by Dr. Lotersztain in the TTA for pain, and after examining Plaintiff, Dr. Lotersztain felt he was "already on adequate treatment: Sulindac, Tylenol #3, sling to immobilize (not wearing it). Explained: No indication for stronger narcotics. Follow-up with PCP as scheduled." | 27. Feinberg Decl. at ¶ 15. |
| 28. On February 18, 2016, Plaintiff saw Dr. Tan, and Plaintiff complained about extreme pain in his elbow, and requested stronger pain medication than his current T3 and Sulindac. | 28. Exhibit G of Appx of Exh.; Tan Decl. at ¶ 3g; Feinberg Decl. at ¶ 16; Ko Decl. at ¶ 6c. |
| 29. Dr. Tan reviewed history of trauma and recent orthopedic surgery consultation recommendations, and on exam, saw that Plaintiff's right elbow had no redness, was able to fully extend to 180 degrees and fully flex, with a small, less than 1 cm, lump on the back of the elbow. | 29. Exhibit G of Appx of Exh.; Feinberg Decl. at ¶ 16. |

| | |
|---|---|
| 30. Dr. Tan noted that Plaintiff "was sitting in waiting area comfortable and move[s] his arm/elbow normally when he walks out of office." | 30. Exhibit G of Appx of Exh.; Tan Decl. at ¶ 3g; Feinberg Decl. at ¶ 16. |
| 31. In his assessment, Dr. Tan felt there was "no indication for stronger narcotics such as morphine or methadone at this time," recommended conservative treatment, continue T3, Sulindac, capsaicin cream, warm compresses as well as an elbow sling, re-evaluating in 4 weeks, and to consider an MRI as advised by Ortho[pedics] if significant pain continues. | 31. Exhibit G of Appx of Exh.; Tan Decl. at ¶ 3g; Feinberg Decl. at ¶ 16; Ko Decl. at ¶ 6c. |
| 32. On or around February 26, 2016, California Correctional Health Care Services received Plaintiff's 602 grievance, SOL HC 16041256, requesting an MRI and stronger pain medication. | 32. Exhibit H of Appx of Exh.; Largoza Decl. at ¶ 5. |
| 33. On March 1, 2016, Dr. Tan examined the Plaintiff again as a follow up to the February 18, 2016 visit, and Plaintiff complained that his pain was not getting better. | 33. Exhibit I of Appx of Exh.; Tan Decl. at ¶ 3h; Feinberg Decl. at ¶ 17; Largoza Decl. at ¶ 7b. |
| 34. Dr. Tan conducted a physical examination of Plaintiff, noting that there was no swelling and no redness of Plaintiff's right elbow, and that there was a small cyst like lump on the dorsal side of his elbow/upper forearm. | 34. Exhibit I of Appx of Exh.; Tan Decl. at ¶ 3h; Feinberg Decl. at ¶ 17; Largoza Decl. at ¶ 7b. |
| 35. Dr. Tan recommended continuing T3 and Sulindac, Capsaicin, and warm compression, as there was "No indication for stronger narcotics [such as] morphine or methadone at this time." | 35. Exhibit I of Appx of Exh.; Tan Decl. at ¶ 3h; Feinberg Decl. at ¶ 17; Largoza Decl. at ¶ 7b. |
| 36. Dr. Tan also noted that he would submit a request for services (RFS) for MRI of right elbow because Plaintiff was having significant pain. | 36. Exhibit I of Appx of Exh.; Tan Decl. at ¶ 3h; Feinberg Decl. at ¶ 17; Largoza Decl. at ¶ 7b. |

| | |
|---|---|
| 37. On March 9, 2016, Dr. Largoza referred Dr. Tan's RFS to discussion with the Institutional Utilization Management Committee (IUMC), a group of physicians at SOL, as the RN of the Institution Utilization Management (IUM) noted that there was "no subset for above" on the RFS, referring to InterQual criteria, a well-respected and widely used medical decision making tool that is utilized to assist with making approval decisions for medical procedures and studies. | 37. Exhibit I of Appx of Exh.; Tan Decl. at ¶ 3h; Feinberg Decl. at ¶ 18; Largoza Decl. at ¶ 7c. |
| 38. On March 16, 2016, Plaintiff submitted a CDCR form 7362 complaining of pain. | 38. Exhibit J of Appx of Exh.; Tan Decl. at ¶ 3i. |
| 39. On March 18, 2016, RN Gardner assessed Plaintiff, and noted that medical staff would follow-up when the MRI would be scheduled, and that his condition on release was "stable." | 39. Exhibit J of Appx of Exh.; Tan Decl. at ¶ 3i. |
| 40. On March 29, 2016, the IUMC considered and denied Dr. Tan's RFS for an MRI for Plaintiff, as Plaintiff had not yet exhausted conservative management and did not have an imminent need for surgery, and recommended to continue conservative treatment for Plaintiff. | 40. Tan Decl. at ¶ 3j; Feinberg Decl. at ¶ 18; Largoza Decl. at ¶¶ 6-10; Ko Decl. at ¶ 6d. |
| 41. Dr. Largoza was on the IUMC, and Dr. Tan was also at the meeting to present Plaintiff's case. | 41. Tan Decl. at ¶ 3j; Largoza Decl. at ¶ 8. |
| 42. Dr. Kuersten was not present for this IUMC meeting and did not participate in any decision to deny Plaintiff an MRI. | 42. Kuersten Decl. at ¶ 6. |
| 43. On April 6, 2016, Plaintiff submitted another CDCR form 7362 complaining of pain. | 43. Exhibit L of Appx of Exh. |
| 44. On April 8, 2016, RN Lajara assessed Plaintiff, noting that Plaintiff already submitted a 602 for increased pain medications, which was denied by his PCP, and that the IUMC denied his MRI. | 44. Exhibit L of Appx of Exh. |
| 45. RN Lajara also noted that Plaintiff's Sulindac was refilled, she would schedule [a] PCP [appointment], and that Plaintiff verbalized understanding and was in stable condition on release. | 45. Exhibit L of Appx of Exh. |

| | |
|---|---|
| 46. On April 29, 2016, Dr. Largoza issued the Institutional level response for Plaintiff's 602 SOL HC 16041256, denying Plaintiff's request for stronger pain medication because it was not medically indicated to prescribe Plaintiff with stronger pain medication, and denying his request for an MRI in that the RFS was already denied by the IUMC. | 46. Exhibit H of Appx of Exh. |
| 47. Dr. Largoza noted that it was recommended to continue monitoring Plaintiff's arm and to treat it conservatively. | 47. Exhibit H of Appx of Exh. |
| 48. On May 9, 2016, Dr. Kuersten was covering for the TTA doctor and examined Plaintiff for Plaintiff's complaint of pain. | 48. Exhibit M of Appx of Exh; Feinberg Decl. at ¶ 19; Kuersten Decl. at ¶ 5c; Ko Decl. at ¶ 6e. |
| 49. Dr. Kuersten noted that there was "No swelling or deformity" in the right elbow, that he "observed [Plaintiff] undressing sweatshirt w/o difficulties" and that Plaintiff was "presenting right elbow pain with conflicting presentation," and "possesses secondary gain issues (reported pain level not compatible with presentation and exam.)." | 49. Exhibit M of Appx of Exh.; Feinberg Decl. at ¶ 19; Kuersten Decl. at ¶ 5c; Ko Decl. at ¶ 6e. |
| 50. Dr. Kuersten placed a medication order for Toradol for pain relief, prescribed a neoprene elbow sleeve, ordered a follow up appointment with Plaintiff's PCP in 14 days, and placed a RFS for a Physical Therapy (PT) evaluation. | 50. Exhibit M of Appx of Exh.; Feinberg Decl. at ¶ 19; Kuersten Decl. at ¶ 5c; Ko Decl. at ¶ 6e. |
| 51. On May 16, 2016, Plaintiff was seen for initial PT consultation, where Plaintiff was instructed in stretches and exercises to improve range of motion, decrease pain, and improve strength. | 51. Feinberg Decl. at ¶ 20. |
| 52. The records indicate that "Patient tolerated treatment well," and follow-up was scheduled. | 52. Feinberg Decl. at ¶ 20. |
| 53. At a PT follow-up on May 23, 2016, Plaintiff reported that he felt more pain when doing the exercises, and was discharged from PT and referred back to his PCP. | 53. Feinberg Decl. at ¶ 21. |
| 54. On May 23, 2016, Dr. Ko examined Plaintiff as a follow up to the May 9, 2016 appointment. | 54. Exhibit N of Appx of Exh.; Feinberg Decl. at ¶ 22; Ko Decl. at ¶ 6f. |

| | |
|---|---|
| 55. Dr. Ko's exam of Plaintiff's right elbow showed that it was essentially normal, with no swelling, no effusion, no heat, and no deformity. | 55. Exhibit N of Appx of Exh.; Feinberg Decl. at ¶ 22; Ko Decl. at ¶ 6f. |
| 56. Dr. Ko noted that Plaintiff completed his last session of PT, recommended to repeat x-rays and to continue treating with T3 and Sulindac, and that the RFS for a MRI was denied by the IUMC on March 9, 2016. | 56. Exhibit N of Appx of Exh.; Feinberg Decl. at ¶ 22; Ko Decl. at ¶ 6f. |
| 57. On June 1, 2016, Plaintiff received an x-ray of his right elbow, as referred by Dr. Ko. | 57. Exhibit O of Appx of Exh.; Feinberg Decl. at ¶ 23; Ko Decl. at ¶ 6g. |
| 58. The x-ray showed a chronic avulsion fracture of the olecranon present with retraction of the fragments, which appeared stable, no acute fracture or dislocation, well-preserved joint spaces, and the visual soft tissues were unremarkable. | 58. Exhibit O of Appx of Exh.; Feinberg Decl. at ¶ 23; Ko Decl. at ¶ 6g. |
| 59. On August 10, 2016, and August 16, 2016, Plaintiff did not appear to take his pain medication. | 59. Exhibit P of Appx of Exh.; Ko Decl. at ¶ 6h. |
| 60. On September 5, 2016, Plaintiff submitted another CDCR form 7362 complaining of pain. | 60. Exhibit Q of Appx of Exh.; Ko Decl. at ¶ 6i. |
| 61. On September 7, 2016, RN Lajara assessed Plaintiff, noting that Plaintiff had not been taking Sulindac, but that she informed him that Sulindac was current and would help his pain, and that the IUMC denied his MRI. | 61. Exhibit Q of Appx of Exh.; Ko Decl. at ¶ 6i. |
| 62. RN Lajara also noted that she requested a refill of Plaintiff's Sulindac submitted it to the pharmacy, and she would request a follow up with his PCP. | 62. Exhibit Q of Appx of Exh.; Ko Decl. at ¶ 6i. |
| 63. On October 3, 2016, Dr. Ko saw Plaintiff, felt that Plaintiff had a small bursitis of the olecranon, told Plaintiff that he would speak to the Utilization Committee again about seeking an MRI, and submitted a RFS for a MRI. | 63. Exhibit R of Appx of Exh.; Feinberg Decl. at ¶ 24; Ko Decl. at ¶ 6j. |
| 64. On October 4, 2016, Plaintiff's MRI was approved. | 64. Exhibit R of Appx of Exh., Exhibit S of Appx of Exh.; Largoza Decl. at ¶ 11; Ko Decl. at ¶ 6j. |

13

| | |
|---|---|
| 65. On October 30, 2016, Plaintiff submitted another CDCR form 7362 complaining of pain. | 65. Exhibit S of Appx of Exh.; Ko Decl. at ¶ 6k. |
| 66. On November 1, 2016, RN Lajara assessed Plaintiff, noting that he was taking Sulindac and T3, and discharged him, noting that he returned to housing and was ambulatory. | 66. Exhibit S of Appx of Exh.; Ko Decl. at ¶ 6k. |
| 67. On November 8, 2016, Plaintiff received an MRI of his right elbow, which suggested there was ongoing triceps tendinosis, intact ligaments, and no osseous or articular abnormalities. | 67. Exhibit T of Appx of Exh.; Feinberg Decl. at ¶ 25; Ko Decl. at ¶ 6l. |
| 68. The MRI did not reveal any nerve damage. | 68. Exhibit T of Appx of Exh.; Ko Decl. at ¶ 6l. |
| 69. Plaintiff was at SJGH from December 2, 2016, to December 5, 2016 for hip pain, and after an orthopedic consultation with Dr. Dowbak, Plaintiff's "physical findings were not consistent with any orthopedic problems." | 69. Exhibit U of Appx of Exh.; Feinberg Decl. at ¶ 26; Ko Decl. at ¶ 6m. |
| 70. The SJGH team recommended "no change in his home medication regime," starting with T3 for chronic pain management, and following up with PCP for chronic pain management. | 70. Exhibit U of Appx of Exh.; Feinberg Decl. at ¶ 26; Ko Decl. at ¶ 6m. |
| 71. On December 7, 2016, Dr. Ko saw Plaintiff for a follow-up appointment after Plaintiff was discharged from SJGH. | 71. Exhibit V of Appx of Exh.; Feinberg Decl. at ¶ 27; Ko Decl. at ¶ 6n. |
| 72. Dr. Ko examined Plaintiff's right elbow and found that the swelling of olecranon bursa had completely resolved, and there were no gross abnormalities. | 72. Exhibit V of Appx of Exh; Feinberg Decl. at ¶ 27; Ko Decl. at ¶ 6n. |
| 73. Dr. Ko also found that there were minimal findings on imaging and physical exam not consistent with the degree of pain claimed. | 73. Exhibit V of Appx of Exh.; Feinberg Decl. at ¶ 27; Ko Decl. at ¶ 6n. |
| 74. Dr. Ko ordered T3s at a standard dose for 14 days. | 74. Exhibit V of Appx of Exh.; Ko Decl. at ¶ 6n. |
| 75. On December 21, 2016, Dr. Ko saw Plaintiff, noting that Plaintiff went to TTA twice, and that Plaintiff was ordered ibuprofen. | 75. Exhibit V of Appx of Exh.; Ko Decl. at ¶ 6o. |

| | |
|---|---|
| 76. Dr. Ko noted that an orthopedic consult in hospital stated "physical findings were not consistent with any orthopedic problems." | 76. Exhibit V of Appx of Exh.; Ko Decl. at ¶ 6o. |
| 77. Dr. Ko also noted that "moaning/crying/complaint" of pain is exaggerated and NOT consistent with minimal findings on imaging and exam. | 77. Exhibit V of Appx of Exh.; Ko Decl. at ¶ 6o. |
| 78. Dr. Ko noted that T3s would expire, but he would renew them one more week at a lower dose. | 78. Exhibit V of Appx of Exh.; Ko Decl. at ¶ 6o. |
| 79. On December 28, 2016, Plaintiff was administered T3 for his pain per an order from Dr. Ko. | 79. Exhibit W of Appx of Exh.; Ko Decl. at ¶ 6p. |
| 80. On December 29, 2016, the Pain Management Committee, including Dr. Kuersten, Dr. Largoza, and Dr. Ko, reviewed Plaintiff's case for ongoing T3s, and they determined T3s and opiates were not indicated for Plaintiff. | 80. Largoza Decl. at ¶ 12; Kuersten Decl. at ¶ 5d; Ko Decl. at ¶ 6q. |
| 81. No pain contract was formed, and Plaintiff would continue to be on a plan to receive pain medication. | 81. Largoza Decl. at ¶ 12; Kuersten Decl. at ¶ 5d; Ko Decl. at ¶ 6q. |
| 82. On December 30, 2016, Dr. Ko saw Plaintiff, noted that Plaintiff had exaggerated moaning of pain, and planned to allow the prescription for T3s to expire. | 82. Exhibit V of Appx of Exh.; Ko Decl. at ¶ 6r. |
| 83. On January 9, 2017, Plaintiff submitted a CDCR form 7362 complaining of pain. | 83. Exhibit X of Appx of Exh.; Ko Decl. at ¶ 6s. |
| 84. On January 10, 2017, Plaintiff went to SJGH for a consultation with Dr. J. Pettegrew, an orthopedist. | 84. Exhibit X of Appx of Exh.; Feinberg Decl. at ¶ 28; Kuersten Decl. at ¶ 5e.; Ko Decl. at ¶ 6s. |
| 85. Dr. Pettegrew conducted a physical examination of Plaintiff's right elbow, and also reviewed the MRI of the right elbow. | 85. Exhibit X of Appx of Exh.; Feinberg Decl. at ¶ 28; Kuersten Decl. at ¶ 5e; Ko Decl. at ¶ 6s. |
| 86. Dr. Pettegrew recommended no surgical intervention, but conservative treatment with physical therapy and oral anti-inflammatories. | 86. Exhibit X of Appx of Exh.; Feinberg Decl. at ¶ 28; Kuersten Decl. at ¶ 5e; Ko Decl. at ¶ 6s. |
| 87. On January 12, 2017, Plaintiff submitted a CDCR form 7362 complaining of pain. | 87. Exhibit Y of Appx of Exh.; Ko Decl. at ¶ 6t. |

| | |
|---|---|
| 88. On January 17, 2017, Plaintiff was seen by RN Lajara, who noted that he would agree to take Capsaicin for pain. | 88. Exhibit Y of Appx of Exh.; Ko Decl. at ¶ 6t. |
| 89. On January 18, 2017, Plaintiff was administered capsaicin topical cream for his pain per an Order from Dr. Ko. | 89. Exhibit W of Appx of Exh.; Ko Decl. at ¶ 6t. |
| 90. On March 21, 2019, Plaintiff was seen by a new PCP, Dr. Mo, for a complaint of right Achilles tendinitis secondary to jumping while playing basketball. | 90. Feinberg Decl. at ¶ 29. |
| 91. Dr. Mo also noted that "[Plaintiff] He has also had problems with his elbows which are relatively stable at this time," and Plaintiff's only current pain medication is over-the-counter Tylenol. | 91. Feinberg Decl. at ¶ 29. |
| 92. T3 with codeine was the strongest recommended pain medication by Dr. Kohler on February 4, 2016, by Dr. Tarrar on February 5, 2016, by Dr. Rohrer on February 8, 2016, by Dr. Lotersztain on February 14, 2016, by Dr. Sweeney on December 2, 2016, as well as on the discharge instructions by the emergency room physician at SJGH after Plaintiff was sent there by Dr. Sweeney that day. | 92. Feinberg Decl. at ¶ 30. |
| 93. The opinion that Plaintiff's medical conditions did not medically justify the prescription of pain medications stronger than T3 with codeine was shared by all physicians treating Plaintiff from February 2016 to January 2017. | 93. Feinberg Decl. at ¶ 30. |
| 94. Chronic pain is a common complaint in prison, and it is the medically accepted standard of care to treat chronic pain with pain medication, physical therapy, exercises, and stretching. | 94. Tan Decl. at ¶ 4; Kuersten Decl. at ¶¶ 7, 9. |
| 95. Medical research shows weak evidence for the effectiveness of long-term opioid therapy for chronic non-cancer pain, as tolerance to opioids develops with repeated administration, which means that a higher dosage will be required to achieve the same effect. | 95. Kuersten Decl. at ¶ 8. |
| 96. Adverse outcomes for opioid pain medication include risks of addiction, overdose, and death. | 96. Kuersten Decl. at ¶¶ 13-14; Ko Decl. at ¶ 7. |

| | |
|---|---|
| 97. An MRI is generally indicated when a patient has failed an adequate trial of conservative management and/or has symptoms or findings that suggest an imminent need for surgical management. | 97. Tan Decl. at ¶ 6; Kuersten Decl. at ¶ 10. |
| 98. No doctor ever told Plaintiff that he needed surgery for his elbow. | 98. Underwood Dep. at 77:5-7; Feinberg Decl. at ¶ 31. |
| 99. Dr. Tan did not believe that his treatment of Plaintiff would endanger Plaintiff or put him at risk of serious harm. | 99. Tan Decl. at ¶¶ 4-12. |
| 100. Dr. Kuersten never intentionally disregarded any significant risk to Plaintiff's health or pain management, and did not believe that Plaintiff had a substantially serious medical need for a different course of treatment than he was provided. | 100. Kuersten Decl. at ¶¶ 14-15. |
| 101. Dr. Largoza did not believe that denying Plaintiff an MRI or stronger narcotic pain management would endanger Plaintiff or put him at risk of serious harm. | 101. Largoza Decl. at ¶ 13. |
| 102. Dr. Ko provided Plaintiff appropriate medical care within the community standard of care and at no time intentionally or knowingly caused Plaintiff any harm. | 102. Ko Decl. at ¶¶ 7-10. |
| 103. Plaintiff has not required an orthopedic surgery follow-up, and currently appears to have no significant issues with his elbows in that he is able to actively play basketball and is on no stronger pain medication than over-the-counter strength Tylenol. | 103. Feinberg Decl. at ¶ 31. |

ECF No. 26-2.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

# V. DISUCSSION

In their motion for summary judgment, Defendants argue: (1) Defendants are immune from suit for damages to the extent they are sued in their official capacities; (2) Plaintiff's claim for injunctive relief is moot; (3) Plaintiff cannot prevail against Defendants Tan, Kuersten, Largoza, and Ko on the merits of his Eighth Amendments claims for medical indifference because they acted appropriately under the circumstances and did not disregard an excessive risk to Plaintiff's health; and (4) Defendants Tan, Kuersten, Largoza, and Ko are entitled to qualified immunity because their conduct did not violate a clearly established right and was reasonable.

### A.     Immunity

Defendants argue they are immune from suit to the extent plaintiff seeks damages against them in their official capacities.  The Court agrees.  The Eleventh Amendment prohibits federal courts from hearing suits brought against a state both by its own citizens, as well as by citizens of other states.  See Brooks v. Sulphur Springs Valley Elec. Coop., 951 F.2d 1050, 1053 (9th Cir. 1991).  The Eleventh Amendment also bars actions seeking damages from state officials acting in their official capacities.  See Eaglesmith v. Ward, 73 F.3d 857, 859 (9th Cir. 1995); Pena v. Gardner, 976 F.2d 469, 472 (9th Cir. 1992) (per curiam).

### B.     Injunctive Relief

In his complaint, Plaintiff seeks permanent injunctive relief in the form of an order that Dr. Ko "remove himself" as Plaintiff's primary care physician.  See ECF No. 1, pg. 11. Citing their undisputed statement of fact no. 90, Defendants argue Plaintiff's claim for injunctive relief is moot because Plaintiff's has been switched to a new primary care physician, Dr. Mo. The Court agrees that the undisputed evidence establishes that Plaintiff's claim for injunctive relief is moot because the relief he has been provided the relief he seeks.  See Murphy v. Hunt, 455 U.S. 478, 481 (1982).

/ / /

/ / /

/ / /

1     **C.**     <u>**Eighth Amendment Claims**</u>

2           Defendants argue the undisputed evidence establishes that they were not

3 deliberately indifferent to Plaintiff's serious medical needs because they responded appropriately

4 to Plaintiff's medical condition and did not disregard an excessive risk to plaintiff's health.

5 Defendants conclude that plaintiff cannot establish these essential elements and, therefore, are

6 entitled to judgment as a matter of law.  The Court agrees.

7           The treatment a prisoner receives in prison and the conditions under which the

8 prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel

9 and unusual punishment.  <u>See</u> <u>Helling v. McKinney</u>, 509 U.S. 25, 31 (1993); <u>Farmer v. Brennan</u>,

10 511 U.S. 825, 832 (1994).  The Eighth Amendment ". . . embodies broad and idealistic concepts

11 of dignity, civilized standards, humanity, and decency."  <u>Estelle v. Gamble</u>, 429 U.S. 97, 102

12 (1976).  Conditions of confinement may, however, be harsh and restrictive.  <u>See</u> <u>Rhodes v.</u>

13 <u>Chapman</u>, 452 U.S. 337, 347 (1981).  Nonetheless, prison officials must provide prisoners with

14 "food, clothing, shelter, sanitation, medical care, and personal safety."  <u>Toussaint v. McCarthy</u>,

15 801 F.2d 1080, 1107 (9th Cir. 1986).  A prison official violates the Eighth Amendment only when

16 two requirements are met: (1) objectively, the official's act or omission must be so serious such

17 that it results in the denial of the minimal civilized measure of life's necessities; and (2)

18 subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of

19 inflicting harm.  <u>See</u> <u>Farmer</u>, 511 U.S. at 834.  Thus, to violate the Eighth Amendment, a prison

20 official must have a "sufficiently culpable mind."  <u>See</u> <u>id.</u>

21           Deliberate indifference to a prisoner's serious illness or injury, or risks of serious

22 injury or illness, gives rise to a claim under the Eighth Amendment.  <u>See</u> <u>Estelle</u>, 429 U.S. at 105;

23 <u>see also</u> <u>Farmer</u>, 511 U.S. at 837.  This applies to physical as well as dental and mental health

24 needs.  <u>See</u> <u>Hoptowit v. Ray</u>, 682 F.2d 1237, 1253 (9th Cir. 1982), <u>abrogated on other grounds by</u>

25 <u>Sandin v. Conner</u>, 515 U.S. 472 (1995).  An injury or illness is sufficiently serious if the failure to

26 treat a prisoner's condition could result in further significant injury or the ". . . unnecessary and

27 wanton infliction of pain."  <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1059 (9th Cir. 1992), <u>overruled</u>

28 <u>on other grounds by</u> <u>WMX Techs., Inc. v. Miller</u>, 104 F.3d 1133 (9th Cir. 1997) (en banc); <u>see</u>

1    also <u>Doty v. County of Lassen</u>, 37 F.3d 540, 546 (9th Cir. 1994).  Factors indicating seriousness

2    are: (1) whether a reasonable doctor would think that the condition is worthy of comment; (2)

3    whether the condition significantly impacts the prisoner's daily activities; and (3) whether the

4    condition is chronic and accompanied by substantial pain.  <u>See</u> <u>Lopez v. Smith</u>, 203 F.3d 1122,

5    1131-32 (9th Cir. 2000) (en banc).

6         The requirement of deliberate indifference is less stringent in medical needs cases

7    than in other Eighth Amendment contexts because the responsibility to provide inmates with

8    medical care does not generally conflict with competing penological concerns.  <u>See</u> <u>McGuckin</u>,

9    974 F.2d at 1060.  Thus, deference need not be given to the judgment of prison officials as to

10   decisions concerning medical needs.  <u>See</u> <u>Hunt v. Dental Dep't</u>, 865 F.2d 198, 200 (9th Cir.

11   1989).  The complete denial of medical attention may constitute deliberate indifference.  <u>See</u>

12   <u>Toussaint v. McCarthy</u>, 801 F.2d 1080, 1111 (9th Cir. 1986).  Delay in providing medical

13   treatment, or interference with medical treatment, may also constitute deliberate indifference.  <u>See</u>

14   <u>Lopez</u>, 203 F.3d at 1131.  Where delay is alleged, however, the prisoner must also demonstrate

15   that the delay led to further injury.  <u>See</u> <u>McGuckin</u>, 974 F.2d at 1060.

16        Negligence in diagnosing or treating a medical condition does not, however, give

17   rise to a claim under the Eighth Amendment.  <u>See</u> <u>Estelle</u>, 429 U.S. at 106.  Moreover, a

18   difference of opinion between the prisoner and medical providers concerning the appropriate

19   course of treatment does not give rise to an Eighth Amendment claim.  <u>See</u> <u>Jackson v. McIntosh</u>,

20   90 F.3d 330, 332 (9th Cir. 1996).

21        The Court observes at the outset that the analysis in this case is necessarily

22   narrowed by Plaintiff's failure to oppose Defendants' motion.  Because Plaintiff has not

23   submitted any response to Defendants' motion, the evidence presented by Defendants is

24   necessarily undisputed.  Moreover, by not opposing the motion, Plaintiff cannot meet his burden

25   on summary judgment of presenting to the Court evidence to indicate a genuine dispute of

26   material fact exists.  In this case, Defendants prevail if they meet their initial burden of

27   demonstrating that Plaintiff cannot establish an essential element of his claims.  As discussed

28   below, Defendants have established that, as a matter of law, Plaintiff cannot prevail.

1          1.      Defendant Tan

2                  Defendants argue that Dr. Tan did not deliberately disregard Plaintiff's medical

3     needs and responded appropriately to Plaintiff's medical condition. Specifically, Defendants

4     state:

5                          Dr. Tan treated Plaintiff by reviewing his history of trauma and
                    recent orthopedic surgery consultation recommendations, physically
6                   examining him, and ordering T3, Sulindac, capsaicin cream, warm
                    compresses as well as an elbow sling to treat Plaintiff's pain. (UMF Nos.
7                   28-29.) There was "no indication for stronger narcotics such as morphine
                    or methadone." (UMF No. 31.)
8
                            Dr. Tan also submitted a RFS for MRI of right elbow within four
9                   weeks of Plaintiff's February 12, 2016 appointment at SJGH with Dr.
                    Holmes. (UMF No. 36.) Dr. Tan's decision to treat Plaintiff's pain with
10                  medication such as T3, Sulindac, and Capsaicin was medically acceptable
                    and consistent with treatment of Plaintiff by other medical professionals.
11                  (UMF Nos. 28-35, 92-94.) Use of conservative pain treatment protocols is
                    medically appropriate. See, e.g., Hamby v. Hammond, 821 F.3d 1085,
12                  1094 (9th Cir. 2016); Reyes v. Smith, No. 2:12-cv-0652-KJM-DMC, 2019
                    WL 250573, at *8 (E.D. Cal. Jan. 17, 2019).
13
                    ECF No. 26-1, pgs. 19-20.
14

15                 The Court agrees with Defendants that Dr. Tan's conduct did not constitute a

16    violation of Plaintiff's Eighth Amendment rights. The record, as presented by Defendants, clearly

17    demonstrates that Dr. Tan reviewed Plaintiff's medical condition, performed physical

18    examinations, prescribed medication, and requested an MRI scan of Plaintiff's arm.  The

19    undisputed evidence establishes that Defendant Tan provided treatment and, therefore, was not

20    deliberately indifferent.

21         2.      Defendant Kuersten

22                 Defendants argue that Dr. Kuersten did not deliberately disregard Plaintiff's

23    medical needs and responded appropriately to Plaintiff's medical condition. Specifically,

24    Defendants state that:

25                         Dr. Kuersten treated Plaintiff at the TTA, physically examined
                    him, and ordered medication for pain relief, an elbow sleeve, and
26                  submitted a RFS for physical therapy. (UMF Nos. 48-50.) Dr. Kuersten
                    also reviewed Plaintiff's case for ongoing T3s on December 29, 2016, and
27                  decided that there was insufficient medical indication to treat Plaintiff's
                    pain with narcotics. (UMF Nos. 80-81.) Dr. Kuersten's treatment of
28                  Plaintiff's pain was consistent with recommendations from other doctors,

                                                        21

1    medically acceptable, and complied with medical standards. (UMF Nos.
2    48-50, 92-94.) See, e.g., Hamby, 821 F.3d at 1094; Reyes, No. 2:12-cv-
     0652-KJM-DMC, 2019 WL 250573, at *8.

3    ECF No. 26-1, pg. 20.

4         The Court agrees with Defendants that Dr. Kuersten's conduct did not constitute a

5    violation of Plaintiff's Eighth Amendment rights. According to the evidentiary record before the

6    Court, Dr. Kuersten treated plaintiff's injury by providing him with a physical examination, an

7    elbow sleeve, and an order for pain medication. As is evident from his complaint, Plaintiff

8    believes that the pain medication he received was inadequate. However, a difference of opinion as

9    to the proper course of treatment is not proper grounds for finding Eighth Amendment deliberate

10   indifference. See Jackson, 90 F.3d at 332.  As with Dr. Tan, the undisputed evidence establishes

11   that Dr. Kuersten provided treatment and, for this reason, was not deliberately indifferent.

12              3.    Defendant Largoza

13        Defendants argue that Dr. Largoza did not deliberately disregard plaintiff's

14   medical needs and responded appropriately to plaintiff's medical condition. Specifically,

15   Defendants state that:

16        Dr. Largoza approved a referral for Plaintiff to orthopedic surgery on
          February 5, 2016, reviewed Plaintiff's medical records and treatment plan in
17        issuing a response to 602 grievance SOL HC 16041256, and reviewed
          Plaintiff's case for ongoing T3s on December 29, 2016, as part of the Pain
18        Management Committee. (UMF Nos. 20, 46, 80-81.) Dr. Largoza's decisions
          to deny Plaintiff's request for stronger pain medication and an MRI complied
19        with medical standards because the IUMC committee considered the request
          and discussed it as a group, none of Plaintiff's requests were medically
20        indicated, as Plaintiff had not yet exhausted conservative treatment and did
          not have symptoms or findings that suggested an imminent need for surgical
21        management, and Plaintiff's health care was being managed and reviewed
          and evaluated on a continuous basis. (UMF Nos. 37, 46-47.)
22
23   ECF No. 26-1, pg. 20.

24        The Court agrees with Defendants that Dr. Largoza's conduct did not constitute a

25   violation of Plaintiff's Eighth Amendment rights. Dr. Largoza was responsible for reviewing

26   Plaintiff's administrative grievance and requests for stronger pain medication and an MRI scan.

27   According to Largoza, the request for stronger pain medication was denied because it was not

28   medically indicated to prescribe Plaintiff with stronger medication. See ECF No. 26-2, pg. 48.

1   Also, Plaintiff's request for an MRI scan was denied because the request Dr. Tan placed for the

2   scan (the RFS) was denied by the Institutional Utilization Management Committee. Thus,

3   Largoza's denial of Plaintiff's requests was not motivated by deliberate indifference to Plaintiff's

4   medical needs but instead an adherence to the decisions of prior physicians and committees. To

5   the extent Plaintiff disagrees with the denial of medication, disagreement with a course of

6   treatment does not give rise to a claim under the Eighth Amendment.

7              4.     Defendant Ko

8              Defendants argue that Dr. Ko did not deliberately disregard plaintiff's medical

9   needs and responded appropriately to plaintiff's medical condition. Specifically, Defendants state

10  that:

11             Dr. Ko treated Plaintiff by physically examining him, continuing
               pain medication, ordering x-rays, and submitting a RFS when Plaintiff had
               a small bursitis of the olecranon. (UMF Nos. 54-58, 63-65, 67-89.) Dr.
12             Ko's treatment was consistent with the community standard of care, as it
               is the medical standard to avoid narcotics that could result in risks of
13             addiction, overdose, and death. (UMF Nos. 92-96, 102.) *See, e.g., Hamby*,
               821 F.3d at 1094; *Reyes*, No. 2:12-cv-0652-KJM-DMC, 2019 WL 250573,
14             at *8.

15             ECF No. 26-1, pg. 21.

16             The Court agrees with Defendants that Dr. Ko's conduct did not constitute a

17  violation of Plaintiff's Eighth Amendment rights. Defendants provide evidence that Dr. Ko

18  examined Plaintiff's medical condition, ordered or requested further examinations, and continued

19  Plaintiff's pain medication. To the extent Plaintiff argues that Dr. Ko's failure to secure him

20  either an MRI scan or stronger pain medication violated his constitutional rights, the Court

21  disagrees. As discussed above, a difference of opinion as to the proper course of treatment does

22  not constitute an Eighth Amendment violation. As with the other Defendants, Plaintiff here, by

23  virtue of his non-opposition, does not offer evidentiary support for the assertion that Dr. Ko

24  deliberately disregarded a risk to Plaintiff's health. Therefore, no genuine dispute of fact exists as

25  to whether Dr. Ko's conduct constituted an Eighth Amendment violation.

26  / / /

27  / / /

28  / / /

1    **D.     Qualified Immunity**

2          Defendants argue that Drs. Tan, Kuersten, Largoza, and Ko are entitled to

3    qualified immunity. The Court agrees.

4          Government officials enjoy qualified immunity from civil damages unless their

5    conduct violates "clearly established statutory or constitutional rights of which a reasonable

6    person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In general,

7    qualified immunity protects "all but the plainly incompetent or those who knowingly violate the

8    law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).  In ruling upon the issue of qualified

9    immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting the

10   injury, the facts alleged show the defendant's conduct violated a constitutional right.  See Saucier

11   v. Katz, 533 U.S. 194, 201 (2001).  If a violation can be made out, the next step is to ask whether

12   the right was clearly established.  See id.  This inquiry "must be undertaken in light of the specific

13   context of the case, not as a broad general proposition . . . ."  Id.  "[T]he right the official is

14   alleged to have violated must have been 'clearly established' in a more particularized, and hence

15   more relevant, sense:  The contours of the right must be sufficiently clear that a reasonable

16   official would understand that what he is doing violates that right."  Id. at 202 (citation omitted).

17   Thus, the final step in the analysis is to determine whether a reasonable officer in similar

18   circumstances would have thought his conduct violated the alleged right.  See id. at 205.

19         When identifying the right allegedly violated, the court must define the right more

20   narrowly than the constitutional provision guaranteeing the right, but more broadly than the

21   factual circumstances surrounding the alleged violation.  See Kelly v. Borg, 60 F.3d 664, 667 (9th

22   Cir. 1995).  For a right to be clearly established, "[t]he contours of the right must be sufficiently

23   clear that a reasonable official would understand [that] what [the official] is doing violates the

24   right."  See Anderson v. Creighton, 483 U.S. 635, 640 (1987).  Ordinarily, once the court

25   concludes that a right was clearly established, an officer is not entitled to qualified immunity

26   because a reasonably competent public official is charged with knowing the law governing his

27   conduct.  See Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982).  However, even if the plaintiff

28   has alleged a violation of a clearly established right, the government official is entitled to

24

1    qualified immunity if he could have ". . . reasonably but mistakenly believed that his . . . conduct

2    did not violate the right."  Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001); see

3    also Saucier, 533 U.S. at 205.

4              The first factors in the qualified immunity analysis involve purely legal questions.

5    See Trevino v. Gates, 99 F.3d 911, 917 (9th Cir. 1996).  The third inquiry involves a legal

6    determination based on a prior factual finding as to the reasonableness of the government

7    official's conduct.  See Neely v. Feinstein, 50 F.3d 1502, 1509 (9th Cir. 1995).  The district court

8    has discretion to determine which of the Saucier factors to analyze first.  See Pearson v. Callahan,

9    555 U.S. 223, 236 (2009).  In resolving these issues, the court must view the evidence in the light

10   most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff.  See

11   Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

12             Defendants argue that all factors indicate that they are entitled to qualified

13   immunity. Specifically, Defendants state that:

14             The undisputed evidence establishes that there are no issues of
       material fact concerning Dr. Tan's, Dr. Kuersten's, Dr. Largoza's, and Dr.
15     Ko's treatment of Plaintiff's pain and request for an MRI. See supra, III.
       Here, Plaintiff's claim regarding the treatment and decisions of Dr. Tan,
16     Dr. Kuersten, Dr. Largoza, and Dr. Ko regarding pain medication and an
       MRI amounts to a difference of opinion as to his medical treatment, which
17     does not rise to the level of a constitutional violation. See Sanchez, 891
       F.2d at 242; Hamby, 821 F.3d at 1092; Miller v. California Dep't of Corr.
18     & Rehab., No. 16-CV-02431-EMC, 2018 WL 534306, at *19 (N.D. Cal.
       Jan. 24, 2018) (granting qualified immunity and finding no constitutional
19     violation for decision to prescribe non-narcotic pain medications even
       where the patient continued to complain of pain while on morphine).
20     Furthermore, there is no clearly established constitutional right to stronger
       narcotic pain medication, as case law demonstrates that use of
21     conservative pain treatment protocols is medically appropriate. See, e.g.,
       Hamby, 821 F.3d at 1094; Reyes, No. 2:12-cv-0652-KJM-DMC, 2019
22     WL 250573, at *8. Nor is there a clearly established right for an
       incarcerated Plaintiff to dictate their medical treatment. See Vaught v.
23     Ugweze, No. 1:11-CV-00623-GBC PC, 2012 WL 6570998, at *5 (E.D.
       Cal. Dec. 17, 2012), aff'd, 542 F. App'x 569 (9th Cir. 2013) (citing
24     Bowring v. Godwin, 551 F.3d 44, 47-48 (4th Cir. 1977). Because
       Plaintiff's allegations do not constitute deliberate indifference, Dr. Tan,
25     Dr. Kuersten, Dr. Largoza, and Dr. Ko cannot be held liable for violating
       his Eighth Amendment rights.
26             Additionally, based on the state of the law in 2016, it is not readily
       apparent that Dr. Tan, Dr. Kuersten, Dr. Largoza, and Dr. Ko pursued a
27     clearly unconstitutional course of treatment concerning Plaintiff's pain and
       need for an MRI, when medical providers prescribed T3s with Codeine
28     and surgery was not required. Dr. Tan, Dr. Kuersten, Dr. Largoza, and Dr.

                                        25

1    Ko assessed Plaintiff as receiving treatment deemed medically necessary.
     (UMF Nos. 9-89, 92-102.) There is no evidence showing that Dr. Tan, Dr.
2    Kuersten, Dr. Largoza, and Dr. Ko consciously disregarded an excessive
     risk to Plaintiff. See UMF Nos. 99-102; cf. Toguchi, 391 F.3d at 1058.
3    Not only did the Defendants lack the mindset necessary to sustain an
     Eighth Amendment violation, but the testimony of expert Dr. Feinberg
4    conclusively establishes that a reasonable doctor could believe that the
     treatment provided was competent. (UMF Nos. 92-93, 99-102.)
5    Additionally, the decision to deny Plaintiff an MRI was considered with
     the IUMC, a group of medical professionals, and Dr. Largoza acted
6    reasonably and would have no reason to believe that his decision would
     violate the Constitution. (UMF Nos. 37, 40.) At a minimum, Dr. Tan, Dr.
7    Kuersten, Dr. Largoza, and Dr. Ko, are entitled to qualified immunity
     from damages because a reasonable doctor could have believed that their
8    treatment and conduct were lawful under the circumstances.

9         ECF No. 26-1, pgs. 27-28.

10        The Court agrees that Defendants are entitled to qualified immunity. It is initially

11   the plaintiff's burden to allege a violation has been clearly established such that the officers

12   should have been on notice. Luna v. Ridge, 436 F. Supp. 2d 1163, 1173 (S.D. Cal. 2006)

13   ("[b]road generalities in the articulation of the constitutional right at issue . . . are insufficient to

14   identify a clearly established right . . ."). "Except in the rare case of an 'obvious' instance of

15   constitutional misconduct . . . [p]laintiffs must *identify a case* where an officer acting under

16   similar circumstances as [defendants] was held to have violated the Fourth Amendment."

17   Sharp v. Cty. of Orange, 871 F.3d 901, 911 (9th Cir. 2017) (emphasis in original) (quoting White

18   v. Pauly, 137 S.Ct. at 552).

19        As discussed above, Plaintiff cannot prevail on his Eighth Amendment claims

20   against the Defendants. Because Plaintiff cannot demonstrate that any constitutional violation

21   occurred, he cannot, as a matter of law, show that Defendants' conduct violated a clearly

22   established right. Therefore, Defendants are entitled to qualified immunity.

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

1

**V. CONCLUSION**

2      Based on the foregoing, the undersigned recommends that:

3      1.      Defendants' motion to dismiss Defendant Egipto, ECF No. 35, be granted;

4      2.      Defendant Egipto be dismissed;

5      3.      Defendants' motion for summary judgment, ECF No. 26, be granted; and

6      4.      Judgement as a matter of law be entered in favor of Defendants Tan,

7 Kuersten, Largoza, and Ko.

8      These findings and recommendations are submitted to the United States District

9 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

10 after being served with these findings and recommendations, any party may file written objections

11 with the court.  Responses to objections shall be filed within 14 days after service of objections.

12 Failure to file objections within the specified time may waive the right to appeal.  See Martinez v.

13 Ylst, 951 F.2d 1153 (9th Cir. 1991).

14

15 Dated:  September 23, 2020

16
                                        _____
                                        DENNIS M. COTA
17                                      UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

27

28